NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0466n.06

Nos. 17-3062/3065

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Sep 11, 2018<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE  NORTHERN DISTRICT OF |
| BRANDON  HEARD  (17-3062) and MILTON | ) | OHIO |
| SHERROD (17-3065), | ) |  |
|  | ) |  |
| Defendants-Appellants. | ) |  |

Before:  MOORE, THAPAR, and LARSEN, Circuit Judges.

**LARSEN, Circuit Judge.**  Milton Sherrod and Brandon Heard were convicted of being felons in possession of firearms in violation of 18 U.S.C. § 922(g)(1).  The district court applied a two-level enhancement to Sherrod's sentence for reckless endangerment during flight under U.S.S.G. § 3C1.2.  The court also varied upward in sentencing both defendants.  On appeal, Sherrod argues that the flight enhancement was improper, and both defendants argue that their sentences are substantively unreasonable.  Having considered the arguments raised by the parties, we AFFIRM the judgment of the district court.

I.

On March 27, 2016, at approximately 4:20 a.m., Sherrod and Heard left a nightclub in East Cleveland, Ohio, and drove to a gas station to meet Sherrod's cousin.  Sherrod was driving a Chevrolet Traverse, and Heard was a passenger in the car.  Both men were convicted felons.  Each had a gun in the car.

While in the parking lot, which an officer testified was filled with fifteen or fewer vehicles, Sherrod and Heard claimed that an unknown male shot at them from another vehicle. Heard said he responded by firing one round from his gun in the air, while Sherrod sped out of the parking lot.

Nearby, two East Cleveland police officers, on patrol in their cruiser, heard at least seven rounds being fired in the vicinity of the gas station. Driving east toward the gas station, they saw the Traverse pull out of the station and speed west down the same road, toward the officers. The officers made a U-turn and activated their lights and siren in an attempt to stop the Traverse. Sherrod and Heard did not stop, instead turning off the main road and leading the officers on a chase, at an estimated speed of 60 miles per hour, through a residential neighborhood. As the Traverse careened through the neighborhood, the officers "saw the vehicle lose control maybe two or three times, almost colliding into trees and things in that area." The chase was short-lived, ending after about a minute, when Sherrod crashed the Traverse into a house.

According to the testifying patrolman, after the crash, Sherrod and Heard climbed out the front passenger window and ran in different directions, each pursued by one officer. The officer who chased Heard testified that he ordered Heard several times to "stop running"; Heard looked back at him during the pursuit, and "that's when he really started running hard." Nevertheless, after a short foot chase, the patrolmen caught both defendants and took them into custody.

Sherrod and Heard maintained at sentencing that they were not trying to flee from law enforcement. They claimed not to know that they were being pursued by officers while in the car. Once they crashed, they claimed to have distanced themselves from the car out of concern for their personal safety. Heard stated that he "stumble[d] out of the vehicle after being in the accident some two seconds later and wander[ed] away from the car . . . in case the car exploded."

Police recovered two firearms from the crash scene: a Smith & Wesson .40 caliber pistol found on the Traverse's front seat floorboard, which Sherrod later admitted was his; and a Taurus .45 caliber pistol found on the ground outside the car, which Heard later admitted was his. At the gas station, police recovered six spent shell casings and "two slugs." No direct evidence linked the bullets to defendants' guns, but a gunshot-residue analysis suggested that Heard either "discharged a firearm, was in the vicinity of a firearm when it was discharged, or handled an item with gunshot primer residue on it."

A federal grand jury charged Sherrod and Heard with one count each of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Both defendants pleaded guilty without a written plea agreement.

During Sherrod's sentencing hearing, the court raised the question whether it should add a two-level enhancement pursuant to U.S.S.G. § 3C1.2 for reckless endangerment during flight. After hearing argument from counsel, and hearing the testimony of one patrolman, the court determined that the facts warranted the enhancement. After the adjustments, Sherrod's Guidelines range was 46 to 57 months. Sherrod maintained his objection to the enhancement. Heard's Guidelines range, calculated at a subsequent sentencing hearing, was also 46 to 57 months. At each hearing, the district court gave notice that it was considering varying upward and continued the hearings to give counsel time to prepare.

When Sherrod's sentencing hearing resumed, the district court varied upward and imposed a 72-month sentence, 15 months above the top of the Guidelines range. In deciding to vary upward, the court considered Sherrod's "[h]istory and characteristics," particularly his prior convictions,[1]

---

[1] The district court noted: "He has prior adult convictions for drug trafficking in 2004, drug abuse, driving under suspension, theft, no operator's license, drug traffic in 2009, drug

his flight from law enforcement, his role as the driver of the vehicle, and the need to afford adequate deterrence and protect the public.

At Heard's resumed sentencing hearing, the government argued that "46 to 57 months [was] not an adequate range for . . . [Heard]" because he had previously "spent nine years in prison for shooting at two people and shooting two others," and at the time of the current offense, he was "on post-release control for that offense." Following a response from Heard, the court varied upward and imposed the statutory maximum sentence of 120 months' imprisonment, 63 months above the top of the Guidelines range. The court acknowledged that Heard was not the driver of the vehicle but decided to vary upward because of the violent nature of Heard's criminal history, his willful possession of a gun when he knew that he was prohibited from legally doing so, his admission that he fired the gun, his flight from law enforcement, and the need to afford adequate deterrence and protect the public.

Sherrod and Heard now timely appeal their sentences.

II.

A criminal sentence must be both procedurally and substantively reasonable. *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). Procedural reasonableness requires the court to "properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Substantive reasonableness, however, focuses on whether a "sentence is too long

---

trafficking and possession of criminal tools, 2010, attempted drug possession and an additional drug abuse conviction."

(if a defendant appeals)." *Id.* at 442. "The point is not that the district court failed to consider a factor or considered an inappropriate factor; that's the job of procedural unreasonableness." *Id.* Instead, substantive unreasonableness is "a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Id.* We review claims of both procedural and substantive unreasonableness for an abuse of discretion, although we review the district court's factual findings for clear error and its legal conclusions de novo. *Id.* at 440, 442.

## III.

## A.

Sherrod first challenges the district court's application of a two-level enhancement for reckless endangerment during flight from law enforcement. U.S.S.G. § 3C1.2 states that a defendant's base offense level may be increased by two levels "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." For the enhancement to apply, a defendant "must know or have reason to know that he is fleeing from a law enforcement officer." *United States v. Hayes*, 135 F.3d 435, 438 (6th Cir. 1998).

Sherrod contends that the sentencing enhancement should not apply for two reasons: he did not endanger another person, and the evidence presented did not demonstrate that he knew he was fleeing from law enforcement. Sherrod first argues that he did not "recklessly create[] a substantial risk of death or serious bodily injury to another person" as required by § 3C1.2, because he did not have a firearm in his possession at the time of his flight, no other persons were at the scene, and he did not engage in any sort of struggle prior to being apprehended. But we cannot say that the district court erred when it concluded that Sherrod endangered others by driving at a

high rate of speed, through a residential neighborhood, recklessly enough that his flight ended only when he crashed his car into a home. We give significant deference to the district court to determine what constitutes endangerment for purposes of § 3C1.2, s*ee United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005), and we cannot say that the district court abused its discretion here.

There is also ample evidence to support the district court's finding that Sherrod knew or had reason to know that he was being pursued by law enforcement. One of the patrolmen testified that the marked law enforcement vehicle was traveling eastbound on Euclid Avenue at 4:20 a.m. with "no traffic." Once the officers observed the Traverse speeding westbound on the same road, coming directly towards the marked police cruiser, the patrol unit made a U-turn to pursue the vehicle. The fact that the Traverse was driving towards the marked law enforcement vehicle on a street with no other traffic indicates that Sherrod knew or should have known that law enforcement was present. Then the patrol unit pursued the Traverse, with lights and siren activated, through the empty streets of a residential neighborhood. Sherrod, nonetheless, continued to drive at approximately 60 miles per hour. After crashing the Traverse into a house, Sherrod and Heard fled on foot in separate directions. In light of this evidence, we are not left with the definite and firm conviction that the district court erred in determining that Sherrod knew or had reason to know that he was being pursued by law enforcement. *See United States v. Wright*, 747 F.3d 399, 407–08 (6th Cir. 2014). The two-level enhancement was not in error.

## B.

Sherrod next challenges the district court's upward variance, which he argues was substantively unreasonable. He makes only one argument in support of this claim: that the district court erred by basing the variance on his flight from law enforcement, which, he contends, was

already adequately accounted for by the Guidelines.[2] This court has consistently rejected what we might take to be Sherrod's general argument: that a sentence is substantively unreasonable whenever a district court considers conduct in imposing a variance that was already used to calculate the Guidelines range. *See United States v. Lanning*, 633 F.3d 469, 477–79 (6th Cir. 2011); *United States v. Tristan-Madrigal*, 601 F.3d 629, 636 n.1 (6th Cir. 2010); *see also United States v. Annese*, 656 F. App'x 761, 764–65 (6th Cir. 2016); *United States v. Brown*, 593 F. App'x 444, 446 (6th Cir. 2014); *United States v. Rossi*, 422 F. App'x 425, 436 (6th Cir. 2011).

Sherrod's more particular arguments regarding the district court's view of his flight from law enforcement also miss the mark. Sherrod argues that he "was fleeing out of fear, not evading the authorities." But the district court found "overwhelming" evidence "that he knew and so did the codefendant that they were being pursued," and we have explained in Section III.A why that conclusion was not clearly erroneous. Sherrod's only other argument is that, in his estimation, his flight in the vehicle posed little danger to others: "The distance travelled by the Traverse was less than a mile. There were no other vehicles on the road. This was not a high speed chase involving multiple other vehicles being passed or any near misses." But the district court disagreed with that characterization, emphasizing the danger posed to officers and the community by a "high speed

---

[2] With respect to Sherrod's flight from law enforcement, the district court said:

> [W]hat makes this case and why this defendant will go to prison for a long period of time is fleeing from law enforcement. When an individual decides to flee from the police, knowing full well that they are—in my view, the evidence is overwhelming that he knew and so did the codefendant that they were being pursued, and then at a high speed chase through a residential neighborhood, placing police, themselves and others in the community in danger, then they must be removed from society and people in the community must know that there will be an extremely lengthy sentence if you choose to do that. And this type of activity cannot in any way, shape or form be minimized and cannot be condoned and there must be a long period of incarceration to send a message that you will not engage in this conduct.

chase through a residential neighborhood," which, we note, ended only when Sherrod crashed the car into someone's home.

The district court, moreover, offered other justifications for the variance beyond Sherrod's flight from law enforcement. The district court noted that "[t]he purpose of the sentencing statute is just punishment, adequate deterrence, protect the public, reflect the seriousness of the offense, and improve the offender's conduct and condition" and concluded that "[t]he guideline sentence in this case is not sufficient . . . to provide what is necessary here." Acknowledging that all of the § 3553(a) factors "come into play when the court renders a decision in the matter," the court concluded that "in this instance, the importance of adequate deterrence and protecting the public is first and foremost." He continued:

> Individuals who choose to possess guns in our communities, who are prohibited from doing so, and then also in the early morning hours at 4:00 a.m., when nothing good transpires, to engage in gunplay, this defendant did not fire a firearm, but he was in possession of a gun and he was in the company of someone who was certainly willing to do so as a result of whatever transpired at that station, and whether or not it was some gang or whatever the circumstances might be is unknown to us and we will not know the specific reasons why. But individuals who choose to engage in this type of conduct must be removed from society for a long period of time, number one.
>
> * * *
>
> . . . This defendant has had numerous opportunities. He's violated the law, albeit drug-related offenses, but there have been probationary periods imposed. None of those things have seemed to work.[3]

---

[3] The dissent asserts that some of these statements were based on unreasonable speculation. But Sherrod has not raised any claim based on unreasonable speculation or otherwise argued that the district court erred in its characterization of these facts. No such claim is, therefore, before us. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

The court, in sum, explained that it was concerned with danger to the community and with both general and specific deterrence, noting in this regard that Sherrod had previous convictions, and that the probationary sentences imposed for them had not "seemed to work."

Sherrod's cursory treatment of the substantive reasonableness issue is focused entirely on the district court's treatment of his flight. His claims in that regard are unpersuasive. Beyond this, he has offered no argument that his sentence was substantively unreasonable—that "the court placed too much weight on some of the § 3553(a) factors and too little on others." *Rayyan*, 885 F.3d at 442. Mindful that the question for this court is not what sentence we would have given, but instead whether the district court abused its discretion by concluding that the § 3553(a) factors, as a whole, justified the sentence imposed, *see Gall*, 552 U.S. at 51, 59–60, we cannot say that Sherrod has shown his sentence to be substantively unreasonable.

## C.

Heard also challenges the substantive reasonableness of the district court's upward variance. Like Sherrod, Heard claims that his sentence was substantively unreasonable because the district court's justification for his sentence included factors for which the Guidelines had already accounted—his prior criminal history, the fact that he had a firearm, and the fact that he was on parole when he committed the crime at issue. But we have already dismissed outright the argument that a district court errs simply by considering conduct previously used to calculate the Guidelines range to justify a variance. *See supra* Section III.B. Beyond this, Heard offers little.[4]

---

[4] Heard also asserts that his sentence resulted in an unwarranted disparity. *See* § 3553(a)(6) (stating that when choosing the particular sentence to be imposed, the court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). But, although labeled differently, his argument merely replicates his claim that the Guidelines had already taken his conduct into account. Beyond this he offers nothing to advance an unwarranted disparity claim. He does not, for example, offer any evidence regarding defendants sentenced for similar conduct nationwide, nor any caselaw that

In explaining its decision to vary upward, the district court stated:

This case presents the court with a defendant and with conduct that is of grave concern and there is very specific reasons [sic] why this defendant needs to be removed from society for a very extensive period of time.

It sets forth the three most, in my view, most dangerous activities that defendants can engage in and which, in fact, is causing extraordinary harm to our cities and we can refer to Cleveland specifically, that is, convicted felons who are armed with loaded firearms in our community.

We have one, we have two in this instance, fully loaded at 4:00 a.m. in the morning, when nothing good can be transpiring and both of them are fully armed. We have an individual who is willing to shoot that firearm. Now he claims that he's doing it in self-defense. There's no evidence to support that other than his bare assertion.

So I have grave doubts as to whether or not this was a shot fired into the air to try in some way scare off others. We have other ammunition that was found on the ground, not consistent or we do not know from whose firearm it may have come from, not defendant's, but certainly he was willing once, again, to use a gun. If he fired it into the air, even that activity in and of itself presents a grave risk of harm to the community.

You can Google, you can check the Internet all you like. There's any number of cases in Cleveland, Ohio, where individuals have been killed and injured, both young and old, by stray bullets in Cleveland, Ohio.

It's readily available to anyone who wishes to look at.

So we have those two most serious types of conduct by a defendant. We have thereafter, more serious conduct, which, again, places the community and others in danger. Whi[l]e the defendant was not driving the car, he was certainly a passenger in the vehicle, that fled from law enforcement.

And then once that vehicle crashes into a residential home in a residential neighborhood, rather than immediately complying with law enforcement, who are pursuing them, knowing that they're pursuing two armed individuals, he decides to flee, to willfully flee, which places himself and law enforcement, a very professional officer, at risk trying to pursue an armed suspect or someone who they knew and possibly believed to be armed.

---

might show a disparity between his sentence and others. *See United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007) ("Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct."). Therefore, we do not consider this as a separate argument for reversal.

And this is a defendant who had just served nine years in custody for the use of . . . hand guns violently to injure two other people and threaten to injure two others. And after nine long years, he returns back to the City of Cleveland, to engage in this type of conduct.

There is nothing more important for this court to do to protect the community than to remove individuals who are willing to do this, engage in this type of conduct for the community as long as possible, because they are a high risk person who are a danger to the community generally, and to law-abiding citizens in these communities who, again, are threatened by this type of violence, and these type of individuals who are possessing guns and willing to use them.

I recognize the guidelines. They're the benchmark. They're the starting point. And I recognize the sentence I'm going to impose is substantially above the guidelines. But the facts as I've just outlined them, I would be remiss if I did not impose the statutory maximum in this case because of the history of this defendant, as I've outlined. Nine years was not enough to keep this defendant from returning to the community with a gun and willingness to use it, and that speaks volumes, and then not willing to comply with law enforcement placing, again, law enforcement at grave risk.

It is clear that the district court determined that the Guidelines range was insufficient to satisfy two § 3553(a)(2) categories—"to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), and "to protect the public from further crimes of the defendant," § 3553(a)(2)(C). The district court recognized that Heard was on parole at the time of the offense and that he had previously served a nine-year sentence for violent firearms offenses, which had injured two people and threatened two more. The Guidelines did not account for the violent nature of his prior offenses, and his prior sentences had done nothing to deter Heard from once again returning to the streets with a gun and firing it. Whether he shot his gun into the air or in the direction of another person, the district court was not unreasonable in concluding that this conduct was a danger to the public. And finally, the Guidelines did not account for Heard's unwillingness to yield to law enforcement.[5] To the district court, Heard remained a danger to the community; he was unwilling

---

[5] The dissent asserts that the district court engaged in unreasonable speculation when discussing Heard's firing of the gun and his role in the car chase. But like Sherrod, Heard makes

to alter his behavior despite several years in prison and on parole and was likely to commit similar crimes again. We see it as no accident that the district court imposed a sentence of ten years, given that Heard had just served nine years in prison and, while on probation, committed a crime that seemed to demonstrate that his previous time in prison had changed little. Given that background, the district court reasonably determined that a ten-year sentence was necessary to satisfy the § 3553(a) factors, namely to protect the community and deter Heard and others from similar conduct in the future.

The record shows that the district court considered the relevant § 3553(a) factors and concluded that a sentence within the Guidelines range was insufficient. We acknowledge the severity of the upward variance in Heard's sentence—63 months above the Guidelines and at the statutory maximum. And we are mindful of the Supreme Court's admonition to trial courts that a major departure, such as Heard's, "should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50. But we are also mindful of the Court's admonition that appellate courts "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance," and that appellate courts must not reverse a district court just because we might believe "a different sentence was appropriate." *Id.* at 51. It is not lost on us that the district court judge in this case imposed the harshest sentence that the law permits. But the law permits such a sentence nevertheless. Our role is to consider whether Heard's sentence is reasonable based on the arguments he presents, not to determine for ourselves whether we would have imposed the same sentence in light of arguments Heard does not raise. *Gall*, 552 U.S. at 51; *see United States v. Houston*, 529 F.3d 743, 755–56 (6th Cir. 2008).

---

no claim based on unreasonable speculation, and has thus forfeited any such claim for appeal. *See supra*, note 3.

Considering the arguments raised by Heard, and giving due deference to the district court's decision that the § 3553(a) factors warranted the upward variance in this case, *see Gall*, 552 U.S. at 51, we cannot say the district court abused its discretion.

\* \* \*

We AFFIRM the judgment of the district court in both cases.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") reflect Congress's desire to prevent unfounded fluctuations in the sentences imposed for violations of federal law. *See* 28 U.S.C. § 991(b)(1)(B); *id.* § 994(f); *United States v. Booker*, 543 U.S. 220, 250, 253 (2005). The Guidelines take into account a number of factors. *See* 28 U.S.C. § 994(c)–(d). Governing precedent recognizes, however, that the circumstances surrounding a given conviction are ineluctably unique, and district judges accordingly have discretion to impose sentences outside of the now-advisory Guidelines' recommended range for a given defendant. *See, e.g.*, *Booker*, 543 U.S. at 250, 253–54, 265. We therefore uphold, for example, above-Guidelines sentences when a district judge reasonably concludes (and sufficiently explains) that the Guidelines have failed to capture the full egregiousness of the circumstances. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 46–47, 50–51 (2007).

But district judges are no more infallible than other human beings, and every once in a while they issue sentences that clearly overstate the egregiousness of the circumstances. We call such sentences "substantively unreasonable," although a nonlawyer might just say that they are needlessly harsh. While we always bear in mind a healthy appreciation for each sentencing judge's superior vantage point and expertise, among our solemn duties as appellate judges is to recognize when a district court's sentence presents an overreaction of this sort. In recognizing such occurrences, we effect the people's will, expressed through their elected representatives, that our criminal-justice system should not keep a person locked away from his family and society any longer than there is a good reason to do so. *See* 18 U.S.C. § 3553(a). I believe that the majority has failed to recognize such an overreaction here.

-14-

Defendants-Appellants Brandon Heard and Milton Sherrod each committed the crime of possessing a firearm after having been convicted of a felony. *See* 18 U.S.C. § 922(g)(1). The firearms were discovered by police after Heard and Sherrod's vehicle, driven by Sherrod, crashed into the brick wall of a house following a chase of about two-thirds of a mile on some deserted residential streets around 4:20 AM. Heard, who had evidently shot his gun into the sky prior to the chase, had previously been convicted of one serious crime, while Sherrod had been convicted of a series of lower-level crimes. Although Heard's Guidelines range was 46–57 months, the district court sentenced him to the statutory maximum of 120 months in prison—ten years. Although Sherrod's Guidelines range was 46–57 months (factoring in a sentencing enhancement for reckless endangerment during flight under U.S.S.G. § 3C1.2), the district court sentenced him to 72 months in prison—six years. Both argue that their sentences were substantively unreasonable, and Sherrod also challenges the enhancement under § 3C1.2. Although I agree with the majority that Sherrod qualified for the enhancement under § 3C1.2, I believe that the significantly above-Guidelines sentences that the district court imposed on Heard and Sherrod were indeed substantively unreasonable. I write to explain why.

## I. BACKGROUND

Although the majority has already well described many of the events surrounding this consolidated appeal, I write to highlight a few important facts.

First, the only indication of gunfire coming from Heard or Sherrod on the night of March 27, 2016, is Heard's admission that he "fired one round into the air" after being shot at by an unknown assailant from another vehicle. R. 34 (Heard Presentence Report ("PSR") at 4 ¶ 14) (Page ID #215). Investigators later discovered, as the majority notes, "six spent shell casings" and "two slugs" in the gas-station parking lot. R. 32 (Sherrod PSR at 4 ¶ 9) (Page ID #189). But "there

was no indication that any of the bullets came from the weapons possessed by Brandon Heard or Milton Sherrod." *Id.* Consistent with their accounts, gunshot-residue analysis later suggested that Heard had in fact fired a gun and that Sherrod had not fired a gun. *Id.* at 5 ¶ 18 (Page ID #190).

Second, as Officer Jonathan Portis, the patrolman who testified in front of the district court, explained, there was no other traffic on the road when Heard and Sherrod passed his patrol car, R. 39 (Sherrod Sentencing Tr. at 14) (Page ID #250), and there was no other traffic on the road during the brief chase, which took place mostly in a "quiet residential neighborhood," *id.* at 15 (Page ID #251). During the chase, Portis and his partner "saw the vehicle lose control maybe two to three times, almost colliding into trees and things in that area," *id.*, prior to the vehicle's collision with the exterior of "a brick house," *id.* at 16 (Page ID #252). There is no indication of damage to the house or peril to any bystander.

Third, as the majority notes, the chase was "short-lived." Maj. Op. at 2. The majority says that it "end[ed] after about a minute," though Officer Portis testified that it lasted "maybe three, no more than four minutes." R. 39 (Sherrod Sentencing Tr. at 19) (Page ID #255). The chase covered roughly 0.68 miles, from the gas station to the point of collision with the brick wall. An undisputed map, entered into the record by Sherrod, shows its path:



R. 40-1 (Sherrod Sentencing Mem. Addendum, Ex. A) (Page ID #292–93). Meanwhile, although the majority states that Sherrod and Heard's car led "the officers on a chase, at an estimated speed of 60 miles per hour," Maj. Op. at 2, that is not exactly right. True, the district court stated that "according to the PSI and apparently police reports, the vehicle was traveling at least 60 miles an hour." R. 39 (Sherrod Sentencing Tr. at 6) (Page ID #242). But that is not record evidence, and in fact it is a distortion of the record; what the PSR actually says is that "the highest speed traveled during the pursuit was 60 miles per hour." R. 34 (Heard Presentence Report ("PSR") at 4 ¶ 11) (Page ID #215). Sherrod may have driven as fast as 60 miles per hour over the course of the 0.68 mile, but it is not clear that he drove that fast throughout, and if Portis is correct that the pursuit lasted "maybe three, no more than four minutes," R. 39 (Sherrod Sentencing Tr. at 19) (Page ID #255), then simple arithmetic suggests that the car's speed was at times considerably slower. In any event, adding up the features of the flight—no one else on the road, roughly two-thirds of a mile, speeds up to (but at times quite possibly less than) 60 miles per hour—it is clear that, as police chases go, this one fell at the less egregious end of the spectrum.

Fourth, there is the brief flight on foot. That was not exactly *The French Connection* either. As the majority notes, after the crash, Heard and Sherrod "exited from the passenger's side window," and, according to Portis, each then "ran on foot." R. 39 (Sherrod Sentencing Tr. at 16) (Page ID #252). Heard ran "on the sidewalk and crossed over through the front of a yard." R. 57 (Heard Sentencing Tr. at 7) (Page ID #365). Officer Portis does not appear to have been terribly concerned; his response to Heard's flight was: "Stop running. You know you're tired." *Id.* (Presumably, a more anxiety-inducing situation would have prompted commands about weapons or peaceful surrender rather than an appeal to simple human fatigue.) Heard did not stop, but then

apparently he "slipped in a grassed area[,] . . . lost control and fell." *Id.* at 7–8 (Page ID #365–66).

At that point, Portis was able to handcuff him with "[n]o difficulty." *Id.* at 8 (Page ID #366).

Fifth, there are "the history and characteristics of" Sherrod and Heard. *See* 18 U.S.C. § 3553(a)(1). At sentencing, as the majority observes, the district court paid special attention to Sherrod's and Heard's criminal histories. *See* R. 58 (Sherrod Sentencing Tr. at 17, 20) (Page ID #389, 392). Sherrod had indeed been convicted of ten crimes, all of which were nonviolent and the most serious of which were three drug trafficking charges of which he was convicted in 2005, 2009, and 2010.[1] R. 32 (Sherrod PSR at 8–12) (Page ID #193–97). Sherrod was also, it bears noting, *see* 18 U.S.C. § 3553(a)(1), a husband, a father of three, a G.E.D. student at Cuyahoga County Community College, and a steadily employed worker in the food-service industry. *Id.* at 14–16 (Page ID #199–201).

The district court also paid special attention to Heard's criminal history. *See* R. 60 (Heard Sentencing Tr. at 26) (Page ID #447). Aside from a conviction for criminal activity on school property and a conviction for disorderly conduct, Heard's criminal past consists of a set of convictions for felonious assault with a firearm from 2006, for which he pleaded guilty and served nine years in prison. R. 34 (Heard PSR at 8–9) (Page ID #219–20). Heard had also, however, earned his G.E.D. while incarcerated for those offenses, and, following his February 2015 release from prison, he had enrolled in Cuyahoga County Community College, where he achieved a 3.0 grade-point average during the 2015 fall semester.[2] *Id.* at 12 (Page ID #223). Prior to his

---

[1] Sherrod was also convicted of driving under a suspended license, theft, driving without a license, possessing criminal tools, attempted drug possession, and, twice, of abusing marijuana. R. 32 (Sherrod PSR at 8–12) (Page ID #193–97). His most recent conviction—for abusing marijuana—had been in 2013. *Id.* at 12 (Page ID #197).

[2] The 2016 spring semester appears to have been interrupted by this case.

incarceration for this offense, Heard had lived with his girlfriend of 14 years. *Id.* at 11 (Page ID #222); R. 30-1 (Heard Sentencing Mem., Ex. C at 1) (Page ID #181). His girlfriend wrote to the district court before sentencing, praising Heard's "new mindset" after his incarceration (she noted that his "eyes lit up when we talked about school") while noting that the couple had later suffered a family tragedy that had been "a very hard issue for [Heard] to deal with." R. 30-1 (Heard Sentencing Mem., Ex. C at 1) (Page ID #181).

Finally, it bears noting that the Government did not specifically request the sentences that the district court handed down in these cases. At Sherrod's sentencing, the Government stated that it did not feel "that a sentence at the highest—or the high end of the range would be appropriate" and that it could "understand how in the heat of the moment some things seem like better decisions than others."[3] R. 39 (Sherrod Sentencing Tr. at 37) (Page ID #273). At Heard's sentencing, the Government did argue "that the court [was] well within its rights here to consider varying upward," R. 60 (Heard Sentencing Tr. at 15) (Page ID #436), but it never suggested that it was seeking an upward variance of such an extreme degree. As noted above, however, the district court, completely of its own accord, varied upward by 15 months from Sherrod's advisory range of 46–57 months and imposed on Sherrod a sentence of 72 months in prison. R. 58 (Sherrod Sentencing Tr. at 12, 21) (Page ID #384, 393). The district court varied upward by 63 months, meanwhile, from Heard's advisory range of 46–57 months and imposed on Heard the statutory maximum of 120 months in prison. R. 60 (Heard Sentencing Tr. at 6, 27 (Page ID #427, 448).

---

[3] The Government did add that "the fact that [Sherrod was] involved with someone, you know, there [were] shots being fired at the gas station, they both had firearms, that's always going to be extremely troubling." R. 39 (Sherrod Sentencing Tr. at 37) (Page ID #273).

## II. DISCUSSION

As the majority notes, we "review all sentences . . . under a deferential abuse-of-discretion standard." *Gall*, 552 U.S. at 41. "An abuse of discretion occurs when the reviewing court is left with the 'definite and firm conviction that the trial court committed a clear error of judgment.'" *United States v. Hunt*, 521 F.3d 636, 648 (6th Cir. 2008) (quoting *Dubay v. Wells*, 506 F.3d 422, 431 (6th Cir. 2007)). We review both procedural and substantive unreasonableness under this deferential standard. *Gall*, 552 U.S. at 51.

"The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010). "A sentence is substantively unreasonable if the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Id.* at 633 (quoting *United States v. Walls*, 546 F.3d 728, 736 (6th Cir. 2008) (internal quotation marks and alterations omitted)). On the other hand, "[t]he fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51 (first alteration in original).

"When conducting this review," we "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* "Although a sentence that falls within the Guidelines range warrants a presumption of reasonableness in this circuit, there is no presumption against a sentence that falls outside of this range." *Tristan-Madrigal*, 601 F.3d at 633 (quoting *United States v. Herrera-Zuniga*, 571 F.3d 568, 590 (6th Cir. 2009)). A district court, however, "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S.

at 50. If a district judge "decides that an outside-Guidelines sentence is warranted," that judge "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*

It is "uncontroversial . . . that a major departure [or variance] should be supported by a more significant justification than a minor one." *See id.* "Accordingly, the amount of deference that is due in any particular case varies: in those cases that fall outside the Guidelines' 'heartland,' the district court's decision to deviate from the advisory range is entitled to the 'greatest respect,' whereas a sentence that departs from the advisory range in a 'mine-run case' warrants 'closer review.'" *Herrera-Zuniga*, 571 F.3d at 582 (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)).

## A. Sherrod

In contrast to the majority, I believe that Sherrod's above-Guidelines sentence was substantively unreasonable. As noted above, the district court decided, of its own accord, to vary upward by 15 months from the top of Sherrod's Guidelines range and impose a sentence of 72 months in prison. To the extent that Sherrod's case is distinct from a "mine-run case" falling within the Guidelines' "heartland," his sentence "warrants 'closer review.'" *See Herrera-Zuniga*, 571 F.3d at 582 (quoting *Kimbrough*, 552 U.S. at 109); *see also, e.g.*, *Gall*, 552 U.S. at 50. The district judge referenced three considerations that might justify the upward variance: Sherrod's involvement with guns, Sherrod's flight, and Sherrod's criminal history. None satisfies.

The district judge began by focusing on the first two of these concerns. First, he said:

Individuals who choose to possess guns in our communities, who are prohibited from doing so, and then also in the early morning hours at 4:00 a.m., when nothing good transpires, to engage in gunplay, this defendant did not fire a firearm, but he was in possession of a gun and he was in the company of someone who was certainly willing to do so as a result of whatever transpired at that station, and whether or not it was some gang or whatever the circumstances might be is

unknown to us and we will not know the specific reasons why. But individuals who choose to engage in this type of conduct must be removed from society for a long period of time, number one.

R. 58 (Sherrod Sentencing Tr. at 19) (Page ID #391). "Number two," he continued, "what makes this case and why this defendant will go to prison for a long period of time is fleeing from law enforcement." *Id.*

We can start with what, in the district court's words, "makes this case": Sherrod's flight from the patrol car. Sherrod counters this justification by arguing that "[t]he high speed flight from the gas station was adequately taken into account with the two point enhancement." Sherrod's Br. at 12. I believe that Sherrod is correct.

To be clear, as the majority correctly notes, the simple fact of the enhancement is in no way dispositive. A district court judge may reasonably conclude that a sentencing enhancement fails to capture fully the egregiousness of the conduct to which it applies. *See, e.g.*, *United States v. Rossi*, 422 F. App'x 425, 436 (6th Cir. 2011); *Tristan-Madrigal*, 601 F.3d at 636 n.1; *see also* U.S.S.G. § 3C1.2 cmt. n.2. Double-counting is not, in and of itself, a problem.

But the question is not whether it is appropriate to double-count in some situations; the question is whether *this* was the kind of situation in which double-counting was appropriate. And as I review the facts of this case, it was not. Instead, we are essentially left to guess as to why Sherrod's flight was more extreme than a "mine-run" flight, *see, e.g.*, *Herrera-Zuniga*, 571 F.3d at 582 (quoting *Kimbrough*, 552 U.S. at 109), that *would* be appropriately taken into account by the § 3C1.2 enhancement and, ultimately, as to why the district court's variance was a reasonable one.

What would be such a case? The Government cites a good candidate, Appellee's Br. at 25: *United States v. Ruiz-Gonzalez*, 552 F. App'x 444 (6th Cir. 2014), a case in which we deemed an above-Guidelines sentence based on reckless flight from law enforcement substantively

reasonable. *Id.* at 446–48. There, the district court had "departed upwards"[4] from an advisory

sentencing range of 30–37 months to impose a sentence of 48 months—an eleven-month shift. *Id.*

at 446. We found no abuse of discretion. *Id.* at 449.

The facts of that case, however, make clear why Ruiz-Gonzalez deserved the eleven-month

increase. For one, during "a Cinco de Mayo celebration in southwest Detroit," he "fired multiple

shots into the crowd," and then, when police "gave chase," he began "driving at a high speed, went

down a one-way street *the wrong way* where children were playing." *Id.* at 445. Contemporaneous

audio from officers on the scene adds that he "accelerate[d] and steer[ed] his vehicle directly

toward the children playing in the street," prompting the officers to cry out, "He's trying to run the

kids over, he's trying to run the kids over." *Id.* As if that were not enough, after two bystanders

"saw Ruiz-Gonzalez coming and pushed the children to safety," "Ruiz-Gonzalez sped up when he

saw the pair, . . . ran over the children's bikes and scooters, missing the children by inches," and

then hit the male bystander, causing him to "fl[y] back upon impact and land[] on the woman."[5]

*Id.* "Even after he hit [the man], Ruiz-Gonzalez continued to flee, going the wrong way down

another one-way street" before "crash[ing] into a parked vehicle." *Id.* Based on all that, we

---

[4] Although Guidelines departures are conceptually distinct from Guidelines variances, *see, e.g.*, *United States v. Grams*, 566 F.3d 683, 687 (6th Cir. 2009), the distinction is not a meaningful one here because the two can be (and often are) supported by similar "facts and analyses," *see id.*, and considering a variance allows "a much broader range of discretionary decisionmaking" than a departure, *United States v. Stephens*, 549 F.3d 459, 466–67 (6th Cir. 2008); *see also Tristan-Madrigal*, 601 F.3d at 635. Thus, because what permitted a departure in *Ruiz-Gonzalez* would almost certainly have alternatively justified a variance in that case, there is no problem in treating *Ruiz-Gonzalez* as appropriately analogous.

[5] The man was hospitalized for two days, and his injuries included "a concussion, broken cheekbone, and fracture below his nose," requiring "reconstructive eye surgery," including "insertion of a metal plate," and "additional surgery to repair his jaw." *Ruiz-Gonzalez*, 552 F. App'x at 445.

concluded that "the district court did not abuse its discretion in departing upward by eleven months."[6] *Id.* at 449.

Sherrod's flight was not nearly so egregious. The record indicates, rather, that Sherrod drove up to 60 miles per hour for approximately two-thirds of a mile on some deserted residential streets at 4:20 AM. That was nevertheless reckless, and thus the § 3C1.2 enhancement makes sense. But what about Sherrod's conduct or circumstances takes him further from the resulting Guidelines' "heartland," such that the district court's variance would merit our "greatest respect"? *See Herrera-Zuniga*, 571 F.3d at 582 (quoting *Kimbrough*, 552 U.S. at 109). And, at bottom, what makes it reasonable?

One aspect of the district judge's explanation clearly does not hold water. In noting Sherrod's otherwise violence-free past, the district judge characterized Sherrod's flight as a violent act. *See* R. 58 (Sherrod Sentencing Tr. at 15) (Page ID #389) ("There is no history of violence it doesn't appear, other than this certainly is violent activity, this fleeing from law enforcement, and his activities in this case clearly indicates grave concerns about this—this defendant."). But that is plainly unsupported by the record here—Sherrod never came close to weaponizing his vehicle

---

[6] In all actuality, our opinion in *Ruiz-Gonzalez* and the accompanying briefing suggests that what the district court in that case called a "departure" under § 3C1.2 was actually just an imposition of the § 3C1.2 enhancement in the first instance. *See Ruiz-Gonzalez*, 552 F. App'x at 446 (stating that the district court *departed* upwards under § 3C1.2 without referencing an underlying enhancement having been applied); Br. of Defendant-Appellant at 12 n.1, *United States v. Ruiz-Gonzalez*, No. 12-2634, 2013 WL 1869632 (6th Cir. Apr. 29, 2013); *see also* Br. of Plaintiff-Appellee, *United States v. Ruiz-Gonzalez*, No. 12-2634, 2013 WL 2903706 (6th Cir. June 4, 2013). If that is true, then it is even more remarkable that the district judge here applied the § 3C1.2 enhancement to Sherrod and then added a *further* upward variance. But even leaving that wrinkle aside, the bottom line is suitably jarring: Ruiz-Gonzalez received 48 months in prison—eleven more than the ceiling of his Guidelines range—after shooting a gun into a crowd, trying to plow over multiple children at play, and in fact plowing into one of the children's rescuers. Sherrod here received 72 months in prison—fifteen more than the ceiling of his Guidelines range—for his far less egregious conduct.

the way that Ruiz-Gonzalez weaponized his. And it also unsupported by current law. *Cf. Sykes v. United States*, 564 U.S. 1, 8–9 (2011) (ruling that "[r]esisting law enforcement through felonious vehicle flight does not meet the requirements of [the Armed Career Criminal Act's force] clause," *id.* at 8, and that it qualifies only under the residual clause because of its "serious potential risk of physical injury to another," *id.* at 9), *overruled by Johnson v. United States*, 135 S. Ct. 2551 (2015) (declaring the residual clause unconstitutional). Ascribing violence to Sherrod's flight fails, in other words, to justify the district court's sentence.

Then there is putative danger to others. The majority rejects Sherrod's argument that "his flight in the vehicle posed little danger to others," reasoning that "the district court disagreed with that characterization, emphasizing the danger posed to officers and the community by a 'high speed chase through a residential neighborhood,' which, we note, ended only when Sherrod crashed the car into someone's home." Maj. Op. at 7–8 (quoting R. 58 (Sherrod Sentencing Tr. at 19–20) (Page ID #391–92)). But how extreme was the actual danger? It was 4:20 AM. There were, by Officer Portis's own admission, no other cars on the road, and no indication that the officers in pursuit were in danger. R. 39 (Sherrod Sentencing Tr. at 14–15) (Page ID #250–51). The whole thing played out over two-thirds of a mile and lasted no more than a few minutes. *See* R. 39 (Sherrod Sentencing Tr. at 19) (Page ID #255); R. 40-1 (Sherrod Sentencing Mem. Addendum, Ex. A) (Page ID #292–93). To be sure, Sherrod crashed into the brick wall of a house, and that explains why he deserves the enhancement, and perhaps even a sentence at the high end of the resulting Guidelines range as well. But there is no indication that any person—or even the wall itself—was harmed. Compared against a case like *Ruiz-Gonzalez,* the district court's decision to vary upward by fifteen months on top of the § 3C1.2 enhancement lacks a "justification . . . sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

The majority points out that "[t]he district court . . . offered other justifications for the variance," specifically the assertion about "gunplay" quoted above, as well as Sherrod's criminal history. *See* Maj. Op. at 8; R. 58 (Sherrod Sentencing Tr. at 19–20) (Page ID #391–92). But these answers also fail to render the sentence substantively reasonable. First, take the "gunplay" assertion. "A district court imposes a substantively unreasonable sentence, and thereby abuses its discretion, when it bases [a] sentence on impermissible factors," *Hunt*, 521 F.3d at 649, a category that includes unsupported speculation, *United States v. Van*, 541 F. App'x 592, 597 (6th Cir. 2013).[7] In *Van*, for example, we ruled that a district court's sentence was substantively unreasonable because "the district court unreasonably based his sentence in part on speculation that [Van] was involved in an unknown criminal 'scheme.'"[8] *Id.* at 597. Because "the record contain[ed] no support for this speculation," the speculation was unreasonable and required resentencing. *Id.* at 598. We came to a similar conclusion in *United States v. Hughes*, 283 F. App'x 345 (6th Cir. 2008), a case upon which *Van* relied, in which we vacated as substantively unreasonable a below-Guidelines sentence, basing our judgment in part on unsupported

---

[7] The majority asserts that Sherrod has failed to argue "unreasonable speculation." Maj. Op. at 8 n.3. It is true, to be sure, that Sherrod does not use the phrase "unreasonable speculation" in his briefing. What he does do, however, is: (1) claim substantive unreasonableness, Sherrod's Br. at 12–13; (2) observe that a sentence is substantively unreasonable when (for example) a district court "bas[es] [a] sentence on impermissible factors," *id.* at 11 (first alteration in original) (citation omitted); (3) argue that "[t]he high speed flight from the gas station was adequately taken into account with the two point enhancement," *id.* at 12; and (4) argue that "[n]o one other than Mr. Sherrod and his co-defendant were ever in any danger," *id.* at 12–13. Faced with that clearly preserved claim and overarching argument, I do not see why we should purposefully shut our eyes to the district court's plain words or to what our own case law (including binding precedent) clearly describes as part of the substantive-unreasonableness analysis, *see Hunt*, 521 F.3d at 649; *Van*, 541 F. App'x at 597, simply because Sherrod (or, more specifically, Sherrod's attorney) has failed to characterize his substantive-unreasonableness claim as well as he could have.

[8] The district court in Van's case had varied upward from a Guidelines range of zero to six months to impose a sentence of nine months' imprisonment. *United States v. Van*, 541 F. App'x 592, 594 (6th Cir. 2013).

speculation by the district court that "all the [victim] bank really want[ed] anyway" was "restitution" from the defendant and that the government prosecuted only because the defendant "simply wasn't paying according to his schedule." *Id.* at 353–54.

The "gunplay" assertions here fall directly into this category. The district judge suggested that Sherrod merited an upward variance, even though he "did not fire a firearm," for having been "in the company of someone who was certainly willing to do so as a result of whatever transpired at that station." R. 58 (Sherrod Sentencing Tr. at 19) (Page ID #391). The district judge continued by stating: "[W]hether or not it was some gang or whatever the circumstances might be is unknown to us and we will not know the specific reasons why. But individuals who choose to engage in this type of conduct must be removed from society for a long period of time, number one." *Id.*

Like the district court's speculative statements about a possible "scheme" in *Van*, 541 F. App'x at 597, the inclusion of these statements suggests that the district court was imputing some nefarious conduct to Sherrod that the record simply does not support. There is zero indication in the record that incident at the gas station had anything to do with "gang" activity. Rather, the only indications in the record are Sherrod's and Heard's assertions that an unknown person began firing a gun at them, at which point *Heard* fired his gun in the sky and Sherrod sped off. *See* R. 32 (Sherrod PSR at 4 ¶ 14) (Page ID #189); R. 34 (Heard PSR at 4 ¶¶ 13–14) (Page ID #215). Later investigation somewhat bolsters this account, suggesting that Sherrod was at least telling the truth that *he* never shot a gun. R. 32 (Sherrod PSR at 4–5) (Page ID #189–90). There is nothing in the record, moreover, to discredit it. *See id.*

To the extent that the district judge in fact relied on his "gunplay" inferences, as the majority concedes that he did, that impermissible speculation alone should be enough to justify

vacating Sherrod's sentence and remanding for resentencing. *See Hunt*, 521 F.3d at 649 ("[I]t does not matter that the district court relied on a number, even a large number, of relevant facts in its sentencing, if it also relied on facts that it could not properly consider. Thus we would not hesitate to reverse a sentence if a judge relied on numerous relevant facts but also relied, for instance, on the morning's horoscope."). But even pushing past that issue to reach the district court's discussion of Sherrod's criminal record, there is simply no justification to explain why Sherrod's criminal record was not adequately accounted for by the Guidelines in this case—that is, why the district court's sentence was, even under our deferential standard of review, reasonable. Yes, Sherrod had the prior convictions that the district judge recited from the PSR. R. 58 (Sherrod Sentencing Tr. at 17) (Page ID #389). That is why the Guidelines calculated his criminal history to be category IV, yielding the 46- to 57-month range. *See id.* at 12, 17 (Page ID #384, 389). What about Sherrod's criminal history was inadequately captured by a category IV? None of his past convictions were violent. Most of them were simple possession crimes—as this one was—or motor-vehicle violations. *See* R. 32 (Sherrod PSR at 8–12) (Page ID #193–97). Had Sherrod had a string of violent felonies, for example, I could understand a district court concluding that the Guidelines' criminal history category failed to account adequately for his past actions. But that is not this case.

Meanwhile, Sherrod also had a family, held down a steady job, and was actively seeking to improve his education. *See id.* at 14–16 (Page ID #199–201). Federal law is crystal clear that "[t]he court, in determining the particular sentence to be imposed, shall consider," among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and we similarly, in reviewing sentences, have been instructed to "take into account the totality of the circumstances, including the extent of any variance from

the Guidelines range," *Gall*, 552 U.S. at 51. Even the Government, seeing all the same facts, stated before the district court that it would be inappropriate, in its view, to impose on Sherrod a sentence at "the high end of the [Guidelines] *range*." R. 39 (Sherrod Sentencing Tr. at 37) (Page ID #273) (emphasis added). Yet the district court, of its own accord, went fifteen months beyond the *top of* that range.

The district court opined here that it saw "the importance of adequate deterrence and protecting the public" as its "first and foremost" considerations in this case. R. 58 (Sherrod Sentencing Tr. at 19) (Page ID #391). There are certainly cases to which that is a justifiable response. But it is also the black-letter definition of substantive unreasonableness to "give[] an unreasonable amount of weight to any pertinent factor." *See, e.g.*, *Tristan-Madrigal*, 601 F.3d at 633 (citation omitted). Here, looking at "the totality of the circumstances," *Gall*, 552 U.S. at 51, I am "left with the definite and firm conviction that the trial court committed a clear error of judgment," *Hunt*, 521 F.3d at 648 (citation omitted), did not offer a reasonably supported justification for deeming this case "outside the Guidelines' 'heartland,'" *Herrera-Zuniga*, 571 F.3d at 582 (quoting *Kimbrough*, 552 U.S. at 109), and instead unreasonably doubled down on incapacitation and deterrence. As appellate judges, we of course must give deference to our colleagues in the district court in fashioning sentences, and we may not simply substitute our own judgment for theirs. *See, e.g.*, *Gall*, 552 U.S. at 51. But we are also responsible for serving as a check on punishment that irrationally breaches the balance mandated by Congress in § 3553(a). *See id.* Seeing such a breach here, I would vacate Sherrod's above-Guidelines sentence and remand for resentencing.

**B. Heard**

Perhaps needless to say, I am also troubled by the district court's more than doubling the upper bound of Heard's Guidelines range to impose the statutory maximum of 120 months in prison. *See* R. 60 (Heard Sentencing Tr. at 27) (Page ID #448). As noted above, "[a] sentence is substantively unreasonable if the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Tristan-Madrigal*, 601 F.3d at 633 (citation omitted). Moreover, "a major [variance] should be supported by a more significant justification than a minor one." *See Gall*, 552 U.S. at 50. Here, the district court's departure was indeed a major one. In support, it ultimately referenced four concerns: Heard's having a gun, Heard's shooting a gun, Heard's flight, and Heard's criminal history. I find none sufficiently persuasive.

As quoted by the majority, the district court initially supported its variance by referencing three "very specific reasons." R. 60 (Heard Sentencing Tr. at 24) (Page ID #445). The first two of them, the district judge explained, were (1) Heard's possession of a gun and (2) his willingness to shoot that gun. *See id.* at 24–25 (Page ID #445–46) ("We have one, we have two [firearms] in this instance, fully loaded at 4:00 a.m. in the morning, when nothing good can be transpiring and both of them are fully armed. We have an individual who is willing to shoot that firearm."). In support of this second point, the district court stated:

> Now he claims that he's doing it in self-defense. There's no evidence to support that other than his bare assertion.
> So I have grave doubts as to whether or not this was a shot fired into the air to try in some way scare off others. We have other ammunition that was found on the ground, not consistent or we do not know from whose firearm it may have come from, not defendant's, but certainly he was willing once, again, to use a gun. If he fired it into the air, even that activity in and of itself presents a grave risk of harm to the community.

*Id.* at 25 (Page ID #446).

There are several problems with these first two explanations. First off, it defies logic to describe possession of firearm as itself being an aggravating factor—after all, that is the underlying crime, 18 U.S.C. § 922(g)(1), to which Heard pleaded guilty. To be sure, as noted above, particularly egregious crimes may well qualify for more extreme sentences than the Guidelines recommend; that is, double-counting is appropriate in some situations. *See, e.g.*, *Tristan-Madrigal*, 601 F.3d at 636 n.1. But those are situations in which the Guidelines' mechanisms fail to capture the full culpability of *the defendant's specific conduct*. *See, e.g.*, *Rossi*, 422 F. App'x at 438. We have certainly never suggested, on the other hand, that prosaically satisfying the element of a crime itself could itself count as an aggravating factor in sentencing. And much less when the act itself is one that is many contexts a protected and even valorized act. *See, e.g.*, U.S. CONST. amend. II. In short, it is clearly unreasonable to base an increase in Heard's sentence for having possessed a firearm on the simple fact that Heard possessed a firearm. Under binding precedent, that alone should be enough to require resentencing. *See Hunt*, 521 F.3d at 649 ("[W]e would not hesitate to reverse a sentence if a judge relied on numerous relevant facts but also relied, for instance, on the morning's horoscope.").

The majority, to its credit, does not endorse this tack, and instead focuses on the reference to Heard's having *fired* the weapon. But the problem here is that even though *firing* a weapon is more egregious than simply possessing one, the district court's statements about Heard's firing of the gun contain the same kind of impermissible speculation just discussed with reference to Sherrod's sentence. *See Van*, 541 F. App'x at 598. In *Van*, the district court had stated, in determining its above-Guidelines sentence, that the defendant's conduct had "implie[d] some sort of scheme[,] the details [of] which are beyond the knowledge of the Court," and that "[t]his defendant has presented a mysterious set of circumstances" that "lead [the court] to think the

guideline range is insufficient to address the circumstances of this defendant's behavior." *Id.* at 597–98. Here, by imputing to Heard more nefarious conduct than simply shooting a gun into the air to distract an assailant, *see* R. 60 (Heard Sentencing Tr. at 25) (Page ID #446) ("There's no evidence to support that other than his bare assertion. So I have grave doubts as to whether or not this was a shot fired into the air to try in some way scare off others."), the district court engaged in the same impermissible and unreasonable speculation that the district court did in *Van*. The district court assailed Heard's "bare assertion," but there was zero evidence in the record on which it could be disputed. In the absence of any such evidence, the district court was not entitled to substitute its own surmise. *Van*, 541 F. App'x at 597–98. And yet again, under binding precedent, that alone should be enough to require resentencing. *See Hunt*, 521 F.3d at 649.

Again to its credit, the majority does not exactly give succor to that speculation either. Instead, it tries to bolster the district court's tacked-on statement that if Heard had in fact "fired [the gun] into the air, even that activity in and of itself presents a grave risk of harm to the community" given the possibility of injury by "stray bullets," R. 60 (Heard Sentencing Tr. at 25) (Page ID #446). But that explanation is not compelling either. First of all, as Heard points out, Heard's Br. at 14, Heard's having shot the gun into the air already earned him a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B). R. 34 (Heard PSR at 7 ¶ 31) (Page ID #218). So, like Sherrod's flight, one has to believe that Heard's shooting his gun into the air was the kind of qualifying act that was so egregious that the § 2K2.1(b)(6)(B) enhancement could not adequately account for it. *See*, *e.g.*, *Herrera-Zuniga*, 571 F.3d at 582.

The problem with this argument is that, while no one disputes that stray bullets do in fact pose a serious risk, as far as I am aware, that scourge is a result of bullets shot at person-level that miss their mark. In fact, we have elsewhere specifically upheld a "three-year upward variance"

("30 percent over the 120-month mandatory minimum") by *distinguishing* the defendant's having "fired shots at the head-level of oncoming police officers" (while, making matters worse, "in the company of his wife and two other individuals, one a juvenile") "from the *ordinary case of a warning shot directed upward*." *United States v. Morgan*, 572 F. App'x 292, 298–99 (6th Cir. 2014) (emphases added). And, as already discussed above, this all happened at 4:20 AM, when the streets were deserted. *See* R. 39 (Sherrod Sentencing Tr. at 14) (Page ID #250). So it is hard to see how the district court could explain varying upward from Heard's Guidelines range—which already included the § 2K2.1(b)(6)(B) enhancement—for having shot a gun into the air in the early morning hours on an empty street. In short, the district court's first two reasons—having a gun and shooting the gun—do not reasonably support an upward variance. Once again, that should be enough to vacate and remand. *Hunt*, 521 F.3d at 649.

The district judge's third stated reason was flight, which, he asserted, "places the community and others in danger." R. 60 (Heard Sentencing Tr. at 25) (Page ID #446). But this too is an incredibly weak justification for an upward variance, because, as the district judge noted, "the defendant was not driving the car," and instead was only "a passenger in the vehicle." *Id.* True, the district judge correctly noted that Heard seems to have briefly fled on foot after the crash. *See id.* at 25–26 (Page ID #446–47). But a realistic review of the record makes clear that there was no real danger to anyone in that scene: Heard appears to have made it across a single lawn before slipping and falling in the grass, allowing the evidently unfazed Officer Portis—whose response was to remind Heard "[y]ou know you're tired"—to handcuff Heard with "[n]o difficulty." *See* R. 57 (Heard Sentencing Tr. at 7) (Page ID #365–66). I simply cannot see how Heard's status as a *passenger* in a fleeing car and then his brief, slightly pathetic flight on foot justifies varying upward, let alone more than doubling the 57-month maximum recommended by

the Guidelines. Here too, the upward variance either rests on impermissible speculation about Heard's role in the car chase that is unsupported by the record, or else it is just plain irrational. The district court's third explanation for varying upward fails.

Finally, we come to Heard's criminal history, which was essentially the district court's (unstated) fourth justification. As noted above, that history boils down to his nine-year imprisonment for felonious assault with a firearm. *See* R. 34 (Heard PSR at 8–10) (Page ID #219–21). As the district court put it:

> [T]his is a defendant who had just[9] served nine years in custody for the use of . . . hand guns violently to injure two other people and threaten to injure two others. And after nine long years, he returns back to the City of Cleveland, to engage in this type of conduct.
> There is nothing more important for this court to do to protect the community than to remove individuals who are willing to do this, engage in this type of conduct for the community as long as possible, because they are a high risk person who are a danger to the community generally, and to law-abiding citizens in these communities who, again, are threatened by this type of violence, and these type of individuals who are possessing guns and willing to use them.

R. 60 (Heard Sentencing Tr. at 26) (Page ID #447).

The majority argues that it was "no accident that the district court imposed a sentence of ten years, given that Heard had just served nine years in prison and, while on probation, committed a crime that seemed to demonstrate that his previous time in prison had changed little." Maj. Op. at 12. But while Heard's criminal history was serious and might well have justified *some* upward variance, it is the only one of the district court's cited explanations left standing. And I do not see how it could alone justify more than doubling the Guidelines' 57-month upper bound for a crime that was markedly less grievous than the one for which Heard served nine years.

---

[9] It had in fact been a little over a year since Heard was released from that nine-year sentence. *See* R. 34 (Heard PSR at 8 ¶ 43) (Page ID #219).

For one, the simple fact of a defendant's recidivism is not enough to justify ratcheting up from the most recent sentence. Consider two defendants, both of whom are released from prison after serving ten-year sentences for shooting someone. One is arrested one year later for shooting someone else. The other is arrested one year later for shoplifting. Both have failed to show that they have ceased committing crimes, but that would not make it substantively reasonable to give them each more than ten years. People do not always stop committing crimes all at once; often, they first progress to committing lower-level ones. That does not mean that they are getting worse or even staying the same. *See* Marc Le Blanc & Rolf Loeber, *Developmental Criminology Updated*, 23 CRIME & JUST. 115, 123, 152 (1998) (discussing "de-escalation" as part of the process of desistance from crime).

Our case law seems to recognize this distinction. In *United States v. Hall*, 664 F. App'x 479 (6th Cir. 2016), for example, we ruled that an upward departure under U.S.S.G. § 4A1.3(a)(1) from 63 months to 96 months was not arbitrary given that the defendant had already been sentenced to 96 months for "a violation of the same federal criminal law" but the relevant conviction was too old for the Guidelines to take it into account. *Id.* at 484–85. "It would make little logical sense," we reasoned, "to impose a more lenient sentence for a subsequent violation of the same federal criminal law simply because the inexorable passage of time rendered some prior convictions too remote to be considered in the Guidelines calculation of the defendant's criminal history category." *Id.* at 485.

That, however, is not this case. Instead, the majority's and the district court's reasoning is belied by the fact that there, Heard served nine years for *shooting at people*, whereas here, all that we can conclude that he did was possess a weapon, fire that weapon into the sky, remain in a car while Sherrod sped away from two-thirds of a mile, and then run across a lawn after Sherrod

crashed. While still criminal behavior, that is objectively less culpable than felonious assault with a firearm—which *was*, to be clear, factored into Heard's Guidelines calculation anyway, in contrast to the situation in *Hall*.

The Government has not, meanwhile, cited a single case in which the sentencing judge more than doubled the Guidelines' maximum, as the district judge did here for Heard. The cases that do feature larger proportional shifts, moreover, also feature far more extensive criminal histories. *See United States v. Bass*, 785 F.3d 1043, 1052 (6th Cir.) (affirming upward variance from 137 months to 264 months for defendant guilty of "masterminding a fraud conspiracy," *id.* at 1046, where district "court noted Bass's 11 prior convictions for theft, dishonesty, fraud, and deceit over the past 20 years," *id.* at 1048), *cert. denied*, 136 S. Ct. 192 (2015); *United States v. Lanning*, 633 F.3d 469, 475–76 (6th Cir. 2011) (affirming upward variance from 24 months to 42 months where district court noted that defendant had "made a living as a thief," *id.* at 475). Thus, while some upward variance might well have been substantively reasonable based on Heard's criminal history, neither the district court at sentencing nor the Government here have offered a compelling rationale for why *this* upward variance—from a Guidelines range of 46–57 months to the statutory maximum of 120 months—was substantively reasonable.

Instead, like Sherrod's sentence, Heard's 120-month sentence also looks an awful lot like the result of the district court "attach[ing] an unreasonable amount of weight," *see Tristan-Madrigal*, 601 F.3d at 633 (citation omitted), to a single factor. *See, e.g.*, R. 60 (Heard Sentencing Tr. at 26) (Page ID #447) ("There is nothing more important for this court to do to protect the community than to remove individuals who are willing to do this, engage in this type of conduct for the community as long as possible . . . ."). The majority says that "the law permits such a sentence nevertheless," Maj. Op. at 12, but that begs the question. Congress has allowed *some*

offenders to be punished by up to 120 months in prison for violating § 922(g)(1), but it has never allowed district judges to dole out that maximum on a whim. The law only "permits such a sentence" if the district judge has indeed complied with § 3553(a) and pronounced a substantively reasonable sentence. *See, e.g.*, *Gall*, 552 U.S. at 51. Weighing "the totality of the circumstances" and "the extent of any variance from the Guidelines range," *id.*, I am here too "left with the definite and firm conviction," *Hunt*, 521 F.3d at 648 (citation and internal quotation marks omitted), that no such sentence was pronounced. While some upward variance may well have been justified in Heard's case, the 63-month upward variance that the district court imposed was, in my view, an abuse of discretion. I believe that the law requires us to vacate and remand for resentencing in Heard's case as well.[10]

### III. CONCLUSION

Under our precedents, I do not see how the district court's stated reasons justified the upward variances imposed in Sherrod's and Heard's cases. The people did not seek such a draconian outcome in either a general sense or a specific sense: Congress requires that sentences be "no[] greater than necessary" in light of its balanced purposes of punishment, 18 U.S.C. § 3553(a), and the Government itself did not seek the sentences that the district court imposed. My writing here has been regrettably long, but not nearly so long as the extra time that Sherrod and Heard will remain deprived of their liberty for no good reason. With great respect for my colleagues in the majority but deep misgivings about the sentences imposed in this case, I dissent.

---

[10] I do recognize, as the majority indicates, that Sherrod's and Heard's submissions to this court have been sparer than one might desire. Although I believe that it is our duty to uphold federal law and grant relief nonetheless given that Heard and Sherrod have plainly argued substantive reasonableness (the only type of claim that I have analyzed here), I therefore understand the majority's affirmance to rest more on "cursory" appellate briefing, than on any particular endorsement of the sentences imposed.